# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-CA-01175-COA

**LEAH CHANCELLOR McKENZIE**  APPELLANT

**v.**

**MATTHEW SCOTT McKENZIE**  APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 10/25/2022 |
| TRIAL JUDGE: | HON. KENNETH M. BURNS |
| COURT FROM WHICH APPEALED: | LAFAYETTE COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | A. E. (RUSTY) HARLOW JR. KATHI CHRESTMAN WILSON |
| ATTORNEYS FOR APPELLEE: | T. SWAYZE ALFORD KAYLA FOWLER WARE |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 05/21/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., WESTBROOKS AND LAWRENCE, JJ.**

**WILSON, P.J., FOR THE COURT:**

¶1.    Matt and Leah McKenzie consented to an irreconcilable differences divorce and agreed that Leah would have physical custody of their three children, that Matt would have specified visitation, and that they would share joint legal custody. They stipulated that the chancellor would determine and divide the marital estate, fix child support, and address Leah's claims for alimony and attorney's fees. The chancellor divided the marital estate, ordered Matt to pay child support and rehabilitative alimony, and denied Leah's request for attorney's fees. On appeal, Leah argues the chancellor erred in dividing the marital estate, in fixing child support, in determining the type and amount of alimony to be paid, and by

denying her request for attorney's fees. We find no abuse of discretion and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. Leah and Matt were married in 2009 and had three children. During the marriage, Matt was a real estate lawyer at the firm of Tannehill Carmean PLLC. He eventually became a partner in the firm, which was renamed Tannehill, Carmean & McKenzie PLLC (TCM). After the McKenzies' second child was born in 2015, they agreed that Leah would be a stay-at-home mother. Leah has a marketing degree and previously worked outside the home.

¶3. During their marriage, Leah and Matt lived a comfortable lifestyle. By 2016, Matt was earning over $400,000 per year, and his income increased steadily to over $1,000,000 per year in 2020. The parties testified that they had no need for a budget. Leah could "get [her] hair done," "take care of [her] skin," and "go out to eat"; the family enjoyed season tickets to Ole Miss football, basketball, and baseball games; and their children enjoyed many extracurricular activities and vacations. However, Matt battled an addiction to alcohol for which he received both in-patient and out-patient treatment.

¶4. In April 2021, Leah filed a complaint for divorce based on irreconcilable differences. She later amended her complaint to allege habitual cruel and inhuman treatment and habitual drunkenness as grounds for divorce. Leah asked Matt to go into a ninety-day inpatient treatment program for his issues with alcohol, but Matt refused, claiming either that he did not have a problem or that he could quit on his own. In September 2021, the parties agreed to a temporary order that granted Leah use and possession of the marital home and use of a credit card for "reasonable, ordinary and necessary living expenses for her and the minor

2

children." The parties later sold the marital home and split the proceeds.

¶5. In May 2022, Matt finally entered into a ninety-day inpatient treatment program. Around the same time, due to Matt's issues with alcohol, his law partners at TCM decided to end their partnership with him. In September 2022, Matt joined two other lawyers to form Harper, Little & McKenzie PLLC (HLM). HLM's operating agreement required Matt to share a greater percentage of the fees he generated with his partners than he had previously shared with his partners at TCM.

¶6. In September 2022, Matt and Leah consented to an irreconcilable differences divorce. They also agreed to share joint legal custody of their children, that Leah would have physical custody, and that Matt would have specified visitation. They submitted other issues to the chancellor to determine, including the division of the marital estate, child support, alimony, and attorney's fees.

¶7. In October 2022, the chancellor entered findings of fact, conclusions of law, and a final judgment granting a divorce and adopting the parties' agreements with respect to custody and visitation. The chancellor found that Matt's average annual adjusted gross income (AGI) while working at TCM from 2017 to 2020 had been $616,612. However, the chancellor projected that Matt's AGI at HLM would be only $163,850.[1] The chancellor also found that Matt "should pay the guideline support" amount of 22% of his AGI.[2] Therefore,

_____

[1] Matt projected a total income of $250,000 and an AGI of $145,000. However, the chancellor "believe[d] that Matt ha[d] somewhat underestimated his projected [AGI]."

[2] The statutory child support guidelines establish a "rebuttable presumption" that child support for three children should be 22% of the payor's AGI. Miss. Code Ann. § 43-19-101(1) (Supp. 2022). The statute further provides that if the payor's AGI exceeds

3

the chancellor ordered Matt to pay child support of $3,000 per month. Matt was also ordered to maintain health insurance for the children. The parties were ordered to split the costs of the children's extracurricular activities and out-of-pocket medical expenses.

¶8.    The chancellor found that neither party had any separate assets and that all their assets and debts accumulated during the marriage were marital. The chancellor found that both "Leah and Matt contributed to this marriage by working outside the home and, although Leah primarily took care of the home and children, Matt often shared these responsibilities." The chancellor found that the net value of the marital estate was $3,402,008. After considering the *Ferguson*[3] factors, the chancellor distributed approximately 49% of the marital estate to Leah and approximately 51% to Matt. After conducting an *Armstrong*[4] analysis, the chancellor ordered Matt to pay Leah $5,000 per month for three years as rehabilitative alimony.[5] Finally, the chancellor found that the parties should pay their own attorney's fees.

¶9.    Leah filed a motion for reconsideration. The chancellor denied the motion except to correct a scrivener's error in the judgment. Leah then filed a notice of appeal.

## ANALYSIS

¶10.    On appeal, Leah argues that the chancellor should have (1) awarded her a larger share

---

$100,000, "the court shall make a written finding in the record as to whether or not the application of the guidelines . . . is reasonable." *Id.* § 43-19-101(4).

    [3] *Ferguson v. Ferguson*, 639 So. 2d 921 (Miss. 1994).

    [4] *Armstrong v. Armstrong*, 618 So. 2d 1278 (Miss. 1993).

    [5] The judgment stated that alimony should be paid both for "five years" and for "36 consecutive months." The order denying Leah's motion for reconsideration clarified that alimony should be paid for three years, not five.

4

of the marital estate, (2) ordered Matt to pay more child support, (3) awarded her permanent alimony or more rehabilitative alimony, and (4) ordered Matt to pay her attorney's fees. We address these issues in turn.

## I.      Equitable Division of Marital Property

¶11.    Leah argues the chancellor's equitable division of marital property was manifestly wrong because the majority of the *Armstrong* factors favored her, but Matt was awarded more of the parties' property. Additionally, Leah alleges that the chancellor did not address the parties' respective needs for financial security or earning capacities. Leah also briefly claims the chancellor failed to divide the furnishings, equipment, and guns at a cabin the couple owned, which allegedly resulted in Matt receiving more than 51% of the assets.

¶12.    "The distribution of marital assets in a divorce will be affirmed if it is supported by substantial credible evidence." *Lowrey v. Lowrey*, 25 So. 3d 274, 285 (¶26) (Miss. 2009) (quotation marks omitted). "When the parties request that the chancellor resolve the issue of property division, the chancellor must do three things: (1) classify the parties' assets as marital or separate, (2) value those assets, and (3) divide the marital assets equitably." *Burnham v. Burnham*, 185 So. 3d 358, 361 (¶12) (Miss. 2015) (quotation marks omitted). The chancellor must use the *Ferguson* factors in dividing the marital estate. *Id.* at (¶13).

¶13.    In *Ferguson*, the Supreme Court identified the following factors that chancellors should consider:

1.      Substantial contribution to the accumulation of the property. Factors to be considered in determining contribution are as follows:

a.      Direct or indirect economic contribution to the acquisition of the

5

property;

> b. Contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties and duration of the marriage; and

> c. Contribution to the education, training or other accomplishment bearing on the earning power of the spouse accumulating the assets.

2. The degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise.

3. The market value and the emotional value of the assets subject to distribution.

4. The value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse;

5. Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution;

6. The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties;

7. The needs of the parties for financial security with due regard to the combination of assets, income and earning capacity; and,

8. Any other factor which in equity should be considered.

*Ferguson*, 639 So. 2d at 928.

¶14. "A chancellor is required to make findings of fact regarding all applicable *Ferguson* factors." *Lowrey*, 25 So. 3d at 285 (¶26). "[M]arital misconduct is a viable factor entitled to be given weight by the chancellor when the misconduct places a burden on the stability

and harmony of the marital and family relationship." *Carrow v. Carrow*, 642 So. 2d 901, 904-05 (Miss. 1994). But "chancellors should not view equitable distribution as a means to punish the offending spouse for marital misconduct." *Bond v. Bond*, 69 So. 3d 771, 773 (¶6) (Miss. Ct. App. 2011) (citing *Carrow*, 642 So. 2d at 904). "Fairness is the prevailing guideline in marital division." *Ferguson*, 639 So. 2d at 929. "[T]here is no automatic right to an equal division of jointly-accumulated property, but rather, the division is left to the discretion of the court." *Id.* at 927 (quoting *Draper v. Draper*, 627 So. 2d 302, 305 (Miss. 1993)); *see also Chamblee v. Chamblee*, 637 So. 2d 850, 863-64 (Miss. 1994) ("[A]n equitable division of property does not necessarily mean an equal division of property."). "We assume for divorce purposes that the contributions and efforts of the marital partners, whether economic, domestic or otherwise are of equal value." *Hemsley v. Hemsley*, 639 So. 2d 909, 915 (Miss. 1994).

¶15. In the present case, applying the *Ferguson* factors, the chancellor found and considered that "Matt's abuse of alcohol ultimately caused the marriage to fail." The chancellor did not err by weighing this factor as part of his *Ferguson* analysis. *Cf. Hammond v. Hammond*, 327 So. 3d 173, 179 (¶18) (Miss. Ct. App. 2021) (explaining that "it is reversible error for the chancellor to fail to consider [marital] misconduct"). Rather, the chancellor appropriately considered the factor without using the property division "as a means to punish" Matt for his misconduct. *Bond*, 69 So. 3d at 773 (¶6). In addition, the chancellor specifically found that Leah's and Matt's economic, domestic, and other contributions to the marriage and home were "of equal value." Again, the chancellor

7

committed no error in his consideration of this factor. *Hemsley*, 639 So. 2d at 915.

¶16. Leah further claims the chancellor failed to address her need for financial security and her comparatively lesser earning capacity. However, the chancellor cited these factors and noted that "[t]he expected needs of the parties are given in their respective Rule 8.05 Financial Statements." *See* UCCR 8.05. The chancellor also discussed Leah's expenses in his *Armstrong* analysis. Finally, in his *Armstrong* analysis, the chancellor expressly found and considered that Leah's "current earning capacity is limited" and that "Matt's earning capacity greatly exceeds Leah's." The chancellor clearly considered these factors even if he did so in part in another section of his opinion. Moreover, even the absence of "an explicit factor-by-factor analysis does not necessarily require reversal where we are satisfied that the chancellor considered the relevant facts." *Seghini v. Seghini*, 42 So. 3d 635, 641 (¶21) (Miss. Ct. App. 2010). The chancellor provided an adequate discussion of the parties' respective earning capacities and financial needs and clearly "considered the relevant facts." *Id.* Accordingly, this issue is without merit.

¶17. Lastly, Leah argues the chancellor failed to divide unspecified furnishings, guns, and equipment located at their cabin. She asserts that this failure resulted in Matt receiving more than 51% of the marital estate. However, Leah offered no evidence of the nature or value of any items the couple kept at the cabin. At trial, Leah simply testified that she and Matt "both ha[d] items at the cabin" that were not included on a list of the parties' personal property that had been admitted into evidence. In the absence of any record evidence regarding this unspecified personal property, we will not find that the chancellor erred. *See*

Deborah H. Bell, *Bell on Mississippi Family Law* § 6.02[1] at 143-44 (3d ed. 2020) ("[I]f the parties themselves omit an asset from the action, title remains with the owning spouse unless the omission is considered fraudulent." (footnote omitted)).

¶18.   In summary, although Matt received assets with a slightly greater net value, "an equitable division of property does not necessarily mean an equal division of property." *Chamblee*, 637 So. 2d at 863-64.  Leah received assets worth $1,653,699.46, including over $1,000,000 in cash and $350,000 from Matt's retirement account, and *no* marital debt. Moreover, the chancellor considered and applied the relevant *Ferguson* factors, and substantial evidence supported the chancellor's findings of fact.  Accordingly, we cannot say that the chancellor committed any reversible error in dividing the marital estate.

## II.    Child Support

¶19.   Next, Leah argues the chancellor understated Matt's AGI and ordered Matt to pay too little child support as a result.

¶20.   "[A]n award of child support is a matter within the discretion of the chancellor and . . . will not be reversed unless the chancellor was manifestly wrong in his finding of fact or manifestly abused his discretion." *Williams v. Williams*, 264 So. 3d 722, 726-27 (¶12) (Miss. 2019) (quoting *Clausel v. Clausel*, 714 So. 2d 265, 266 (¶16) (Miss. 1998)).  "Furthermore, the process of weighing evidence and arriving at an award of child support is essentially an exercise in fact-finding, which customarily significantly restrains this Court's review." *Id.* at 727 (¶12) (brackets and quotation marks omitted).

¶21.   "The underlying principle regarding child support is the legal duty owed by the

parents to the child for the child's maintenance and best interests." *Adams v. Adams*, 467 So. 2d 211, 215 (Miss. 1985). "[T]he payment is made to a custodial parent, but . . . it is for the benefit and best interest of the child." *Id.* "[O]ur law obligates each spouse to provide financially for his or her children, given his or her resources and opportunities." *Cumberland v. Cumberland*, 564 So. 2d 839, 845 (Miss. 1990).

¶22. "Mississippi's child support guidelines establish a 'rebuttable presumption' that the non-custodial parent should pay twenty-two percent of the parent's adjusted gross income for the support of three children." *Gussio v. Gussio*, 371 So. 3d 734, 745 (¶21) (Miss. Ct. App. 2023) (quoting Miss. Code Ann. § 43-19-101(1)). However, if the payor's AGI exceeds $100,000, the court must "make a written finding in the record as to whether or not the application of the guidelines . . . is reasonable." Miss. Code Ann. § 43-19-101(4). "In the absence of specific sufficient evidence of past earnings and employment history to use as the measure of an obligated parent's ability to pay, the recommended child-support obligation amount should be based on available information about the specific circumstances of the obligated parent." *Id.* § 43-19-101(5).

¶23. Leah argues that Matt's child support obligation should have been based on his income while he was a member of TCM. Specifically, Leah argues that because "Matt's average [AGI] for the last five years was $616,612.00, . . . child support should be set at $11,304.55 a month." However, Matt was no longer working at TCM because his former partners terminated him. Matt started at a new law firm, HLM, only a few days before trial. Matt hoped that he would generate enough business at HLM to earn a gross annual income

of $250,000. Matt testified that he expected to earn less money at HLM because he would have to split fees earned on real estate and transactional matters with another partner who also had a real estate practice. Matt would also have to share some of his fees with HLM's managing partner in consideration of the managing partner's administrative responsibilities. HLM's operating agreement was admitted into evidence and corroborated Matt's testimony. Matt testified that this was a significant change from his arrangement at TCM, where he essentially retained the fees he generated less his share of overhead and other firm expenses. Matt testified that he was trying to rebuild his law practice but that it would be difficult given the circumstances of his termination by TCM. Matt's practice was shut down completely while he was in inpatient treatment for ninety days, and all the staff he had hired at TCM remained employed at TCM. TCM's managing partner, Rhea Tannehill, testified that TCM had hired a new real estate lawyer to try to retain Matt's former clients and business.[6]

¶24. Based on the available evidence, the chancellor found that Matt had slightly underestimated his AGI and that Matt could anticipate an AGI of $163,850 going forward. Because Matt had been terminated by TCM and had just started at a new firm with a significantly different revenue-sharing model, the chancellor did not manifestly err or abuse his discretion by declining to set child support based on Matt's prior earnings.[7] Rather,

---

[6] When Tannehill was asked whether there was any reason that Matt could not continue to be successful at HLM, he stated, "I don't think I can say. . . . I don't know what his situation is with business. Will he be able to get real estate business, absolutely. He is well liked in this community. He knows a lot of people."

[7] Although Matt is certainly responsible for his termination by TCM and the damage done to his law practice, that is not a sufficient reason to order him to pay child support based on his pre-termination earnings. For example, in *Parker v. Parker*, 645 So. 2d 1327,

11

substantial evidence supports the chancellor's finding that Matt would likely earn significantly less in the immediate future than he had prior to the closure of his practice at TCM. The chancellor did not abuse his discretion by setting child support based on "available information about the specific circumstances" that Matt faced in attempting to restart his practice at HLM. Miss. Code Ann. § 43-19-101(5). In addition, we note that the chancellor found that the 22% statutory guideline should apply notwithstanding that Matt's AGI exceeded $100,000. *Id.* § 43-19-101(4). Finally, there is no evidence in the record to suggest that $3,000 per month is insufficient support for the McKenzies' children.[8] Accordingly, we find no error with respect to child support.

### III.   Alimony

¶25.   Leah next argues the chancellor erred in determining the type and amount of alimony to be paid by Matt. She asserts that the *Armstrong* factors favor an award of permanent alimony. She also argues that the chancellor's award does not address the "deficit" she faces following the divorce and does not allow her to maintain the standard of living she was accustomed to during the marriage.

¶26.   "The chancellor has considerable discretion in determining the amount and type of alimony." *Craft v. Craft*, 825 So. 2d 605, 611 (¶22) (Miss. 2002). "We will not disturb the

---

1330-31 (Miss. 1994), the Supreme Court affirmed a reduction in child support based on the payor's involuntary termination due to on-the-job misconduct. The Court reasoned, "[T]he essential fact is that the income is gone," and "there is no proof that the income was jettisoned in bad faith, that is to avoid the child support obligation." *Id.* at 1330.

[8] We note that this amount significantly exceeds the expenses that Leah listed for the children on her Rule 8.05 financial statements.

12

award on appeal unless it is found to be against the overwhelming weight of the evidence or manifestly in error." *Pearson v. Pearson*, 761 So. 2d 157, 165 (¶25) (Miss. 2000). "[A]ny award of alimony must be based upon a determination of need for such award upon a finding of a deficit suffered by a party after completion of the equitable division of marital property." *Jackson v. Jackson*, 114 So. 3d 768, 777 (¶22) (Miss. Ct. App. 2013). "But the 'deficit' to which our cases refer is not one spouse's receipt of assets with a lesser net value than those allocated to the other spouse." *Layton v. Layton*, 181 So. 3d 275, 282 (¶17) (Miss. Ct. App. 2015). "Rather, the question is whether the spouse seeking alimony is left 'with a deficit *with respect to having sufficient resources and assets to meet his or her needs and living expenses.*'" *Id.* (quoting *Jackson*, 114 So. 3d at 777 (¶22)).

¶27.    "Periodic alimony is awarded on the basis of need, generally in monthly installments." *Stroh v. Stroh*, 221 So. 3d 399, 412 (¶44) (Miss. Ct. App. 2017). "The purpose of permanent periodic alimony is to be a substitute for the marital-support obligation.  The award of permanent periodic alimony arises from the duty of the financially independent spouse to support the financially dependent spouse." *Harris v. Harris*, 241 So. 3d 622, 625 (¶8) (Miss. 2018) (citation and quotation marks omitted).

¶28.    In contrast, rehabilitative alimony "is an equitable mechanism which allows a party needing assistance to become self-supporting without becoming destitute in the interim." *Hubbard v. Hubbard*, 656 So. 2d 124, 130 (Miss. 1995). "Rehabilitative alimony is awarded to parties who have put their career on hold while taking care of the marital home. Rehabilitative alimony allows the party to get back into the working world in order to

become self-sufficient." *Lauro v. Lauro*, 847 So. 2d 843, 849 (¶15) (Miss. 2003).

¶29. "If one party is left with a deficit, the chancery court must consider the *Armstrong* factors in determining whether to award alimony and the amount and type of the award." *Leblanc v. Leblanc*, 271 So. 3d 494, 505 (¶51) (Miss. Ct. App. 2018). The *Armstrong* factors include: (1) the income and expenses of the parties; (2) the health and earning capacities of the parties; (3) the needs of each party; (4) the obligations and assets of each party; (5) the length of the marriage; (6) the presence or absence of minor children in the home, which may require that one or both of the parties either pay, or personally provide, child care; (7) the age of the parties; (8) the standard of living of the parties, both during the marriage and at the time of the support determination; (9) the tax consequences of the spousal support order; (10) fault or misconduct; (11) wasteful dissipation of assets by either party; or (12) any other factor deemed by the court to be just and equitable in connection with the setting of spousal support. *Armstrong*, 618 So. 2d at 1280.

¶30. In the chancellor's analysis of the *Armstrong* factors, he found that Leah had a form of arthritis and could need a future hip surgery, that the parties enjoyed a high standard of living, that Matt's misuse of alcohol contributed to the demise of the marriage, and that there was no wasteful dissipation of assets. The chancellor also found that Leah's earning capacity was limited and that "Matt's earning capacity greatly exceeds Leah's," but the chancellor reasoned that "Leah has a college degree, and she should eventually become employable." Ultimately, the chancellor determined that rehabilitative alimony was the type of alimony that best suited the case and awarded Leah $5,000 per month for three years.

14

¶31. Substantial evidence supports the chancellor's factual findings, and we cannot say that the type or amount of alimony awarded was an abuse of discretion. While Matt's earning capacity clearly exceeds Leah's, the chancellor found that Leah "should eventually become employable." Leah was thirty-six years old at the time of trial. She has a B.A. in marketing from the University of Mississippi and previously worked as an account manager for a finance company and as a sales representative. She testified that she had also "opened [her] own marketing firm" before she decided to stay home after the birth of her second child. Rehabilitative alimony, along with the substantial assets she received in the divorce, provides Leah with assistance until she can resume her career and become self-supporting.

¶32. Leah argues that the alimony award will not allow her to live the life she became accustomed to during the parties' marriage; however, Matt has lost the job and income that supported their lifestyle. Based on the evidence presented at trial, Matt cannot afford the same lifestyle for himself, let alone for two households. A financially independent husband may be "required to support his [ex-]wife in the manner to which she has become accustomed, *to the extent of his ability to pay*." *In re Conservatorship of Geno v. Geno*, 365 So. 3d 287, 295 (¶18) (Miss. Ct. App. 2021) (quoting *Rogillio v. Rogillio*, 57 So. 3d 1246, 1250 (¶11) (Miss. 2011)), *cert. denied*, 326 So. 3d 466 (Miss. 2021). Given Matt's job loss and anticipated reduction in income, the chancellor did not err or abuse his discretion in determining the type or amount of alimony to award. *See id.* (finding no error in the type or amount of alimony awarded because the payor had experienced a reduction in income, and "the chancellor . . . found that [his] current earnings would not allow either [party] to live in

15

the manner to which they had become accustomed during the marriage").

### IV. Attorney's Fees

¶33. Lastly, Leah argues the chancellor erred by not awarding her attorney's fees. She argues that she is unemployed and should not be required to liquidate her assets to pay her attorney's fees because Matt can afford to pay them.

¶34. The issue of attorney's fees "is largely a matter entrusted to the sound discretion of the [chancellor]; absent abuse of discretion, the chancellor's decision in such matters will generally be upheld." *Riley v. Riley*, 846 So. 2d 282, 287 (¶23) (Miss. Ct. App. 2003). "An award of attorney's fees is appropriate in a divorce case where the requesting party establishes an inability to pay." *Gray v. Gray*, 745 So. 2d 234, 239 (¶26) (Miss. 1999). "The party seeking attorney's fees is charged with the burden of proving inability to pay . . . ." *Riley*, 846 So. 2d at 287 (¶23). "It is well settled in Mississippi that if a party is financially able to pay an attorney, an award of attorney's fees is not appropriate." *Alford v. Alford*, 298 So. 3d 983, 993 (¶35) (Miss. 2020) (quoting *Gray*, 745 So. 2d at 239 (¶26)). "Furthermore, if the record is insufficient to demonstrate the [requesting party's] inability to pay the attorney's fees, then an award of the fees is an abuse of discretion." *Id.* "A party's ability to pay fees is based on their income, expenses, and assets. Assets received by a spouse as part of equitable distribution may be considered in determining ability to pay." Bell, *supra*, § 10.01[3][a] at 333. But "a party is not required to liquidate all assets to pay for attorney's fees." *Branch v. Branch*, 174 So. 3d 932, 946 (¶60) (Miss. Ct. App. 2015).

¶35. The record indicates that Leah's attorneys billed her a total of $32,114 for legal

services.  Leah testified that she had already paid her attorneys $15,000 to $20,000 with funds Matt provided or marital funds.  This suggests that at the time of trial, Leah owed her attorneys another $12,000 to $17,000.  The chancellor found that Leah was "receiving substantial assets and alimony" and that she had already "used marital funds to pay" part of what she owed her attorneys.  Under these circumstances, the chancellor found that Leah and Matt should "each [be] responsible for compensating their respective attorneys for the balance of their attorney's fees."  Because Leah received assets in the divorce that she can use to pay the remaining balance she owes to her attorneys, the chancellor did not abuse his discretion by denying Leah's request for attorney's fees.

## CONCLUSION

¶36.   For the reasons discussed above, the chancellor did not abuse his discretion in dividing the marital estate, setting child support, awarding alimony, or denying Leah's request for attorney's fees.  Therefore, the judgment is **AFFIRMED**.

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND EMFINGER, JJ., CONCUR.  SMITH, J., NOT PARTICIPATING.**

17